UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE BURTON SAVAGE, JR.,

Plaintiff,

v.

DENNIS, GARTLAND & NIERGARTH, PC, et al.,

Defendants.

_______________________________/

Case No. 1:25-cv-800

Hon. Hala Y. Jarbou

**OPINION**

Plaintiff George Burton Savage, Jr., brings this lawsuit against Defendants Dennis, Gartland, and Niergarth, PC, and DGN, LLC (collectively "DGN"), for age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq.* Before the Court is DGN's motion for summary judgment (ECF No. 34). For the reasons explained below, given the undisputed facts, no reasonable jury could find that Savage was terminated based on his age. Accordingly, the Court will grant summary judgment to DGN and dismiss the case.

**I. BACKGROUND**

DGN is an accounting firm that hired Savage as a network administrator in November of 2009. (*See* Savage Dep. 28, ECF No. 34-4.) Savage's job duties included "run[ing] the networks, set[ting] up accounts, [and] manag[ing] the servers." (*Id.* at 26.) He also had duties outside of a traditional network administrator role, including managing the building's security system and providing "help desk" tech support to individual employees. (*Id.* at 27–28.) DGN grew over the years, hiring more employees and adding an additional office, and Savage's duties increased

accordingly. (*See id.* at 32–33.) Savage generally received positive performance evaluations and his compensation increased over time. (*See* Performance Evaluations and Compensation Records, ECF Nos. 35-4, 35-5, 35-6, 35-7.)

In Savage's telling, the issues with his employment began at his performance review in 2021. During the performance review interview in July, Shelly Bedford, a managing partner at the firm, asked Savage "when [he was] going to retire." (Savage Dep. 94.) At the time, Savage was 60 years old. Savage said he hadn't thought about his retirement plans, and Bedford replied, "Oh, come on, 1 year, 2 years, 5 years, 10 years?" (*Id.*) Savage responded, "Closer to 10," and Bedford replied, "[O]kay." (*Id.*) They did not discuss the issue further in the interview. At Savage's performance review interview the following year, Bedford again asked him when he planned to retire, and told him, "I'm going to keep asking this every year until I know. I want at least two years' notice." (*Id.* at 95.) Bedford testified that she asked these questions as a standard "practice of succession practice." (Bedford Dep. 119, ECF No. 34-5.)

According to Savage, after the July 2021 performance interview, Bedford started to treat him with increasing hostility. Savage testified that Bedford began "a campaign of pressure" in September of 2021 and that he "could do nothing right anymore" in her eyes. (Savage Dep. 84, 88.) Bedford "would come into [Savage's] office multiple times a day . . . and then just yell about something, just berate me for some reason." (*Id.* at 86.) When Bedford saw Savage interacting with another employee, she would come over "and yell at [Savage] in front of whoever [he] was with." (*Id.*) During meetings, Bedford would frequently criticize Savage's suggestions with "obvious negativity." (*Id.*) Savage felt that Bedford was attempting to force him to retire. (*Id.* at 84.) He testified that a few days after he applied for a job with one of DGN's clients, Bedford

became nicer to him temporarily, although she eventually resumed her mistreatment. (*Id.* at 104–05.)

Savage also came to believe that DGN was planning to replace him with a younger employee. In August of 2021—a few weeks after the 2021 performance review interview—DGN hired Chris Nuckels, who was around 35 years old, as an IT support specialist, a newly created position in the IT department. (*See* Hiring Announcement, ECF No. 34-7.) According to the hiring announcement, Savage would "continue his work as network administrator and focus on [DGN's] hardware, systems, and security among other things," while Nuckels would "serve as [DGN's] I.T. help desk and help [DGN] improve technologically." (*Id.*) The announcement also stated that Savage and Nuckels would "overlap in duties and cover each other during time off." (*Id.*)

Nuckels did not initially take away any of Savage's duties, and the two roles were separate enough that Savage did not really know what Nuckels was working on. (Savage Dep. 90–91.) However, Savage began to suspect that DGN was planning to replace him with Nuckels. On Nuckels's second day at DGN, he came up to Savage and asked him how old he was. (*Id.* at 92.) Savage responded that he was 61, and Nuckels walked away. (*Id.*) Savage found the entire interaction suspicious. Savage and Nuckels began attending weekly meetings to discuss network issues. (*Id.* at 66.) At a meeting in late September—a month after Nuckels had been hired—Bedford asked Nuckels, "Do you think you can run the network without [Savage] here?" (*Id.* at 91.) Nuckels initially said that he needed more time to get up to speed, but when Bedford asked the same question at a subsequent meeting, Nuckels replied in the affirmative. (*Id.*) In addition, Nuckels took on projects that Savage viewed as falling under his own purview as network

administrator, such as moving DGN's system to the cloud and transferring its email system to Microsoft 365. (*Id.* at 43–44.)

In March of 2022, DGN experienced a cyberattack that temporarily prevented the company from accessing its network. (*Id.* at 60.) The attack targeted the VMware system, which was under Savage's supervision. (*See id.*) According to Savage, the attack "stopped [DGN] in its tracks and presented a potential of a serious breach." (*Id.* at 63–64.) Savage and the IT team managed to regain access to the network about five days later. (*Id.* at 61.) Savage testified that no one at DGN blamed him for the cyberattack, nor was he ever reprimanded or disciplined. (*Id.* at 126.) At his performance review in June of 2022, Savage received a salary increase and bonus, and his supervisor wrote that Savage "was instrumental" in addressing the cyberattack. (2022 Performance Evaluation and Compensation Records, ECF No. 35-7, PageID.992.) In her testimony, Bedford observed that Savage "was involved in overseeing the vendor that could have prevented" the cyberattack, although she did not "have enough information to know if" Savage was to blame for the attack. (Bedford Dep. 169–70.) She also indicated that Savage had "[n]ot stay[ed] current with the current risk[s]" regarding cybersecurity. (*Id.* at 170.)

In June of 2022, DGN hired a cybersecurity company, N1 Discovery ("N1D"), as a consultant to assess DGN's security in light of the cyberattack. (*Id.* at 51.) Bedford testified that some problems arose between N1D and Savage, who did not always respond to N1D promptly and sometimes "push[ed] back and resist[ed] their guidance." (*Id.* at 136.) Ultimately, "N1D recommended that DGN engage a Managed IT Service Provider ('MSP')"—essentially, an outside firm to handle IT—"to provide expanded and experienced resources to better mitigate cybersecurity risk and address DGN's evolving and expanding technology and security needs." (Bailey Aff. ¶ 10, ECF No. 34-11.) N1D relayed this recommendation to DGN sometime in 2022;

according to Bedford, N1D told DHN that it "was at risk with [its] current [IT] team." (Bedford Dep. 118.) Bedford was initially reluctant to outsource network security to an MSP, and decided to stick with in-house IT for the time being. (*Id.*) Meanwhile, Nuckels resigned from his position in June of 2023, and DGN hired Zebulon McCauley, who was forty-three years old, to fill his position. (*See id.* at 133–34.) Savage's responsibilities did not change when McCauley joined. (Savage Dep. 110.)

At some point in 2023, after further assessment of DGN's systems, N1D again recommended contracting with an MSP. (*See* Bailey Aff. ¶ 11.) Ultimately, in August of 2023, Bedford decided to eliminate the network administrator position and work with an MSP instead. Bedford testified that this "was a business decision" that was not easy to make, but she ultimately concluded it was best for the firm's security. (Bedford Dep. 166.) DGN terminated Savage on August 22, 2023. (Termination Letter, ECF No. 34-13, PageID.871.) Savage's termination letter stated that "as a result of DGN's reorganization of its information technology function due to business need, the Network Administrator position was eliminated." (*Id.*) Throughout August, and continuing after Savage's termination, DGN inquired with various MSPs about their services. (*See,* e.g., 415 Group Emails, ECF No. 35-17; Kraft Kennedy Proposal, ECF No. 35-18.) Ultimately, DGN accepted a proposal dated September 28, 2023, from NetSource One. (*See* NetSource Proposal, ECF No. 34-14.) Working with NetSource One cost less than paying Savage's salary. (*See* Bedford Dep. 168–69.) Bedford testified that saving money was one consideration in terminating Savage, but the primary consideration was DGN's security needs. (*Id.* at 169.) DGN avers that McCauley later resigned in November of 2023 and DGN did not fill his position, though it does not cite any evidence to support this claim.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288–89 (1961)). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

"[T]he standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Trs. of Iron Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC*, 115 F.4th 480, 488 (6th Cir. 2024) (alteration in original) (quoting *Pineda v. Hamilton County*, 977 F.3d 483, 491 (6th Cir. 2020)). "[W]hen the moving party bears the burden of proof [at trial], their initial summary judgment burden is higher in that [they] must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Id.* (cleaned up). When the moving party does not bear the burden of proof at trial, they may meet their initial burden at summary judgment by "submitting affirmative evidence that negates an essential element of the nonmoving party's claim," *Kava v. Peters*, 450 F. App'x 470, 473 (6th Cir. 2011) (cleaned up), or by "pointing out the lack of evidence to support an essential element" of that claim, *Rockwood Auto Parts, Inc. v. Monroe County*, 155 F.4th 557, 566 (6th Cir. 2025) (cleaned up). The

nonmovant must then present "sufficient evidence from which a jury could reasonably find in [their] favor." *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1230 (6th Cir. 2025) (cleaned up).

## III. ANALYSIS

Savage brings claims under the ADEA and the ELCRA, which both prohibit age discrimination in employment. *See* 29 U.S.C. § 623; Mich. Comp. Laws §§ 37.2201–2202. Claims under these two statutes are subject to the same legal standard. *Geiger v. Tower Auto.*, 579 F.3d 614, 626 (6th Cir. 2009). Discriminatory motive may be established by either direct or circumstantial evidence; because Savage lacks any direct evidence of discriminatory motive, he must rely on circumstantial evidence. *See id.* at 620–22. When a claim of discrimination rests on circumstantial evidence, the Court applies the *McDonnell Douglas* burden-shifting framework at summary judgment. *See id.* at 622. Under that framework, the plaintiff has the burden of establishing the four elements of a prima facie case: "1) that [the plaintiff] was a member of a protected class; 2) that he was discharged; 3) that he was qualified for the position held; and 4) that he was replaced by someone outside of the protected class." *Id.* "If the termination arises as part of a work force reduction, [the Sixth Circuit] has modified the fourth element to require the plaintiff to provide additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Id.* at 623 (internal quotation marks omitted).

"Once a plaintiff satisfies [his] *prima facie* burden, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action." *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010). If the employer provides a nondiscriminatory reason, "the burden of production shifts back to the plaintiff to show that the employer's explanation was a mere pretext for intentional age discrimination." *Id.* Although the burden of production shifts, "[t]he burden of persuasion . . .

remains on the ADEA plaintiff at all times to demonstrate that age was the 'but-for' cause of their employer's adverse action." *Id.* (internal quotation marks omitted). Because the ADEA requires but-for causation, it is not enough for the plaintiff to merely show "that age was one motivating factor in [the employer's] decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009); *see also Rouch World, LLC v. Dep't of C.R.*, 987 N.W.2d 501, 512 (Mich. 2022) (applying but-for standard to ELCRA). "The condition that a plaintiff's age must be the 'but for' cause of the adverse employment action is not equivalent to a requirement that age was the employer[']s only consideration, but rather that the adverse employment action *would not have occurred without it*." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (cleaned up).

There is no dispute that Savage was a member of a protected class and was discharged. But the parties disagree about whether Savage has satisfied the third and fourth elements of a prima facie case. Savage contends that his consistently positive performance reviews indicate he was qualified for the position. DGN agrees that Savage was qualified for the position he held for many years, but argues that its changing security needs required new, heightened qualifications going forward—qualifications that Savage did not possess. However, Savage's alleged inability to address DGN's new security needs is also DGN's proffered nondiscriminatory reason for terminating him, and the Court cannot consider an employer's proffered reason for termination when analyzing the plaintiff's prima facie case. *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000) (noting that it is "inappropriate for the district court . . . to rely on the nondiscriminatory reason for termination to find plaintiff's prima facie case inadequate"); *see also Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 585 (6th Cir. 2002) (applying *Cline* to ELCRA claim). This rule applies even if the employer's nondiscriminatory reason is "that, in the employer's view, the plaintiff was not meeting its legitimate expectations for the position at issue."

*Id.* Putting aside the issue of DGN's new security needs, it is otherwise undisputed that Savage was qualified for his job, so he has established the third element of a prima facie case.

However, Savage has failed to establish the fourth element. The parties disagree as to whether Savage was replaced after his discharge or whether his discharge instead constitutes a work force reduction. Although Savage suggests that he was essentially replaced by McCauley, DGN notes that "[a] person is not considered replaced when his duties are absorbed by another person 'or when the work is redistributed among other existing employees already performing related work.'" *Geiger*, 579 F.3d at 623. Of course, an employer cannot take advantage of this rule by hiring the replacement immediately before terminating the plaintiff and framing the replacement as an "existing employee." *See, e.g.*, *Vincent v. Brewer Co.*, 514 F.3d 489, 495 (6th Cir. 2007) (employee hired the day before plaintiff was terminated constituted plaintiff's replacement); *Buckosh v. Bonded Filter Co., LLC*, No. 1:21-cv-975, 2022 WL 3681793, at *2 (N.D. Ohio Aug. 25, 2022) (employee hired 16 days before plaintiff was terminated constituted plaintiff's replacement). But McCauley's role was created in August of 2021, when Nuckels was hired, two years before Savage's termination. Under those circumstances, it would be inaccurate to characterize Nuckels or McCauley as Savage's replacement—rather, they served in a distinct role that only somewhat overlapped with Savage's, so they could absorb Savage's duties without "replacing" him.

The circumstances here are similar to those in *Lockett v. Marsh USA, Inc.*, 354 F. App'x 984 (6th Cir. 2009), where the plaintiff argued that her employer had transferred and replaced her for discriminatory reasons. The employer hired the supposed replacement twenty-one months before the plaintiff's transfer. Portions of the plaintiff's responsibilities were initially shifted to the new (replacement) employee, and more of the plaintiff's responsibilities were given to the new

employee when the plaintiff was transferred to a different role. The Sixth Circuit held that the plaintiff had not been replaced; rather, the plaintiff's duties had been shifted to an existing employee. *See id.* at 993. Along the same lines, Savage was not replaced by Nuckels or McCauley; insofar as his responsibilities were given to McCauley after he left, those responsibilities were shifted to an existing employee, whose position had existed for two years (even if McCauley himself had not held the position for that long). Moreover, there is simply no basis for Savage's theory that DGN created Nuckels' position as a ploy to conceal its eventual discriminatory firing of Savage (two years later).

Savage's argument that McCauley replaced him runs into an additional obstacle: it appears that Savage's responsibilities were primarily taken on by NetSource One. NetSource One cannot be Savage's replacement for purposes of his prima facie case because NetSource One is an entity with which DGN contracts for services, not an employee. Even if such an entity could be considered a "replacement," Savage does not claim that NetSource's employees are younger than him. Savage *does* contend that NetSource One did not take on his responsibilities because DGN did not contract with NetSource One until about a month after he had left, so presumably McCauley was handling Savage's duties in the interim. But the fact that McCauley was able to temporarily handle network administration while the transition to NetSource One took place does not indicate that DGN considered McCauley to be Savage's replacement. Moreover, Bedford's testimony suggests that N1D had some role in assisting with the transition (*see* Bedford Dep. 162–63), so it is not clear that McCauley was single-handedly managing the network between Savage's termination and NetSource One's start date.

All this to say, Savage was not replaced by another employee, and his termination is best understood as a work force reduction. Thus, to establish a prima facie case, Savage must "provide

additional direct, circumstantial, or statistical evidence tending to indicate that [DGN] singled out [Savage] for discharge for impermissible reasons." *Geiger*, 579 F.3d at 623. Savage points to various pieces of evidence that purportedly show DGN singled Savage out, but none support the inference that DGN terminated Savage based on age. First, Bedford's questions to Savage about when he would retire are not indicative of a discriminatory motive; every company has a legitimate interest in anticipating when employees will leave. If anything, Bedford's questions cut against Savage's case—she told him that she wanted two years' notice regarding his retirement, which suggests (contrary to Savage's theory) that she did not want him to immediately resign.

Second, although Savage claimed that Bedford started treating him with hostility starting in September of 2021, there is no indication that that treatment was connected to his age. For one thing, the timeline does not support Bedford's theory: Bedford learned that Savage was not retiring soon in July of 2021, hired his supposed replacement a month later, started treating him poorly the following month, and then did not fire him for another two years. It is implausible that firing Savage was Bedford's plan all along. And even if Bedford's hostile treatment of Savage was connected to the July 2021 interview, it was not necessarily age-based. Bedford learned in that conversation that Savage would not be leaving the company anytime soon; perhaps she had non-age-based reasons for hoping that he would retire, and became more hostile after realizing he was sticking around. Moreover, the fact that Bedford apparently became nicer to Savage after he applied for another job weighs against rather than in favor of his claim, as it indicates she did not want him to leave the company despite the way she allegedly treated him.

Third, Savage argues that DGN intended all along for Nuckels to replace him, but the evidence does not support that contention. Although Nuckels took on a couple of the projects that Savage may have otherwise worked on, Nuckels did not directly take any work away from Savage,

and his duties were primarily related to the IT help desk, not network administration. The fact that Nuckels asked Savage how old he was does not suggest any discriminatory intent on the part of DGN. Nor do Bedford's questions to Nuckels about whether he could run the network without Savage reveal any impermissible motives. It is reasonable for a company to be concerned about contingency plans when one member of its staff runs their entire network.

In short, Savage has failed to establish a prima facie case of age discrimination. Even if he had done so, DGN has articulated a plausible alternative explanation for his termination: after experiencing a significant cyberattack, it determined based on N1D's analysis that an MSP was better suited than in-house IT staff to meet its evolving security needs. Savage's attempts to refute this explanation are unsuccessful.

Savage notes that no one blamed him for the cyberattack, but DGN management could have believed both that Savage had responded well to the attack and that an MSP was a safer solution going forward. Moreover, the fact that N1D made its initial recommendation in 2022 but Bedford decided to retain Savage as network administrator weighs against Savage's contention that Bedford was simply looking for an excuse to fire him. Savage also points out that DGN did not contract with an MSP until several weeks after his termination, but this does not undermine DGN's explanation because there is evidence that DGN was comparing MSPs before it terminated Savage and simply had yet to settle on a particular firm.

Savage also argues that DGN did not need to replace him with an MSP because he would have been able to match the capabilities of an MSP had he been given the proper software. (Savage Dep. 125.) But N1D found that DGN "was at risk with [its] current team" and that Savage did not "ha[ve] the skillset to maintain [DGN's system] once [N1D] stepped away." (Bedford Dep. 118.) Even if an employer's justification for discharging an employee is based on false information, a

plaintiff cannot establish pretext where "the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998); *see also Jewett v Mesick Consol. Sch. Dist.*, 957 N.W.2d 377, 386 (Mich. Ct. App. 2020) ("An honest belief, even if ultimately found to be objectively incorrect or improvident, precludes a finding of pretext or bad faith."). DGN reasonably relied on N1D's conclusion, reached after an investigation of DGN's systems, that contracting with an MSP was the best way to meet DGN's security needs. And Savage does not dispute that switching to an MSP saved DGN money. Although Savage may disagree with N1D about the relative merits of using an MSP versus in-house IT support, this Court's role is not that of "a 'super personnel department,' overseeing and second guessing employers' business decisions." *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006) (quoting *Verniero v. Air Force Acad. Sch. Dist. No. 20*, 705 F.2d 388, 390 (10th Cir. 1983)).

Moreover, even if Savage could establish that DGN's purported explanation for terminating him is pretextual, he would also have to show that the real reason for his firing was discriminatory. *See Harris v. Metro. Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 486 (6th Cir. 2010) ("A defendant's proffered reason cannot be proved to be a pretext unless it is shown *both* that the reason was false, and that discrimination . . . was the real reason." (internal quotation marks omitted)). Of course, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). But as explained above, there is no evidence in the record from which a reasonable jury could infer that Savage was fired due to his age. Thus, Savage has failed to meet his burden to overcome DGN's motion for summary judgment.

## IV. CONCLUSION

Savage has failed to establish a prima facie case or to refute DGN's alternative explanation for his discharge. Thus, the Court will grant DGN's motion for summary judgment.

An order and judgment will enter in accordance with this Opinion.

Dated: September 28, 2026

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE